In re EDGEWATER SUN SPOT, INC., Debtor.

In re Edgar L. and Jane E. MATHIEU, Debtors.

Bankruptcy Nos. 91–02304, 91–02303.

United States Bankruptcy Court, N.D. Florida, Panama City Division.

Oct. 12, 1994.

C. Edwin Rude, Jr., Tallahassee, FL, for Pennington & Haben.

David Fleming, Gulf Breeze, FL, for debtors.

## MEMORANDUM OF OPINION

LEWIS M. KILLIAN, Jr., Bankruptcy Judge.

THIS CAUSE is before the Court for consideration of Pennington and Haben, P.A.'s fee application and the Debtors' objection to the fee application. The Court having heard argument of counsel, and having reviewed the pleadings and other documents in the file, finds that Pennington and Haben, P.A. is entitled to the full amount of compensation requested in the fee application, as supplemented.

In early July 1991, Edgar L. Mathieu ("Mathieu") retained Pennington and Haben, P.A. ("P & H")[1] to file Chapter 11 petitions on behalf of Mathieu and his wife, and for Edgewater Sun Spot, Inc. ("ESS"), Mathieu's company (collectively referred to herein as the "Debtors"). Mark Hildreth ("Hildreth"), a P & H associate, was assigned to handle Debtors' cases. The voluntary Chapter 11 petitions were filed on August 9, 1991, and the cases were ordered to be jointly administered. Shortly thereafter, Hildreth notified the Debtors by letter dated September 30, 1991, that he was leaving Tallahassee and P & H to join the firm of Abel, Band, Russell, Collier, Pitchford & Gordon in Sarasota, Florida. Hildreth stated that he would be available to assist P & H with the plan and other administrative details of the Debtors' Chapter 11 cases.

D. Andrew Byrne ("Byrne"), joined P & H in August of 1991. Upon Hildreth's departure, Byrne assumed full responsibility for representation of the Debtors. However, in a meeting with the Debtors on October 9th and 10th of 1991, it was decided to bring Hildreth back in to handle the Chapter 11 administration and Byrne would concentrate on a lender liability claim against Bay Bank and Trust ("Bay Bank"), the major adversary of the Debtors.

The lender liability claim was based upon commercial loans that the Debtors obtained from Bay Bank in March of 1987. The Debtors already had a Small Business Administration (SBA) loan in the amount of approximately $400,000. Debtors wanted to finance the acquisition of a new store with a new loan from Bay Bank of $600,000. According to the Debtors, instead of following their instructions, Bay Bank allegedly issued two new loans in the amount of $1.35 million[2], and extinguished the existing SBA loan in the process. The loan documents were signed by the Debtors in March of 1987. Mathieu alleges that he was pressured by Bay Bank officials into signing these documents and never even read the loan agreements at the closing. Mathieu further alleges that he had no intentions of terminating the existing SBA loan in this manner or of incurring such a significant debt load.

Notwithstanding the circumstances behind the loans, Mathieu made payments without protest for over four years and remained current on the loans through the time he decided to file Chapter 11. It was only when he began having difficulty meeting the debt service and meeting all of his other obligations that he sought legal counsel to attempt to obtain relief against the bank.

1. At the time of the retention, the firm was known as Pennington, Wilkinson and Dunlap. Due to a merger in 1993, the name of the firm was changed to Pennington, Haben, Wilkinson, Culpepper, Dunlap, Dunbar, Richmond and French, P.A. For purposes of this application, the firm will be referred to as Pennington and Haben (P & H).

2. One loan issued by Bay Bank and Trust was SBA guaranteed in the amount of $650,000. The second loan for $700,000 was issued by Bay Savings Bank.

From the very beginning of the relationship between Mathieu and P & H, the case strategy was to use the Chapter 11 to obtain discovery from the bank and to use the lender liability claim as leverage in order to obtain the bank's consent to a favorable reorganization plan. While Hildreth disputed this position at the hearing on P & H's fee application, his October 18, 1991 letter to Byrne reads differently. In that letter Hildreth clearly stated that he did not believe that the Debtors had "any substantial affirmative claims against Bay Bank" and that "[i]n my opinion, however, the facts which we are aware of could probably be used more to benefit a settlement of the Chapter 11 case on terms favorable to our clients as opposed to any type of affirmative action against the bank in the future." Hildreth's letter noted that it would be most efficient if he limited his involvement to preparation and drafting of the major bankruptcy documents like the Plan and the Disclosure Statement. Byrne confirmed with Hildreth by letter dated January 2, 1992, that Hildreth would work on the plan negotiations and strategy and that P & H would concentrate on the Debtors' lender liability claim against Bay Bank.

The relationship between the Debtors and Bay Bank had rapidly declined after the filing of the petition. In November of 1991, Bay Bank moved for relief from the stay or for adequate protection, although the hearing was repeatedly postponed and was never held. In December 1991, Debtors filed their first Joint Plan of Reorganization, to which Bay Bank promptly filed an objection. On April 1, 1992, the Debtors filed an adversary proceeding against Bay Bank, objecting to the secured claim and asking for a determination of the validity and extent of the liens and seeking affirmative relief under various lender liability theories. In late June of 1992, Debtors filed a Disclosure Statement and the first Amended Plan. Negotiations between the parties continued and a settlement was proposed by Hildreth in July of 1992, without success. The second Amended Plan was filed in late August 1992. The third Amended Plan was filed in March 1993.

Discovery was being conducted by P & H throughout this period on the adversary proceeding issues. The adversary proceeding complaint alleged a breach of fiduciary duty, fraud and negligent misrepresentation, breach of contract and misapplication of loan proceeds, negligent mishandling of loans, and a violation of 12 U.S.C. § 1972 (anti-tying). The adversary proceeding was vigorously litigated by the parties. Numerous motions were filed and much discovery was conducted. One witness attempted to avoid service of the subpoena and even refused to answer questions at a deposition. Another witness's deposition was the subject of a motion to compel by Bay Bank. A hearing was held in June of 1993 on summary judgment motions by both sides. After that hearing, at the suggestion of the parties, the Court entered an Order Requiring Mediation. Hildreth continued to negotiate a settlement and made a written confirmation of a proposal by letter dated September 20, 1993. This proposal was not accepted.

In November of 1993, the parties met for mediation. At the opening of the mediation, Bay Bank made a settlement proposal that was very similar to the terms Hildreth had negotiated earlier. Mathieu went to lunch with the mediator [3], at the request of Hildreth or Byrne, to allow Mathieu a chance to relate his side of the case without others present. Throughout the day there was not much movement although Bay Bank did grant a few small concessions, but Mathieu refused to settle without receiving cash in hand from Bay Bank in addition to any other terms. Mathieu testified that Byrne became irate when the Debtors refused to accept a settlement offer. Mathieu said that Byrne demanded immediate payment of $50,000 or else he quit. Both Byrne and the mediator deny that Byrne made such a statement. Byrne had attempted to explain to Mathieu that the settlement was the best alternative, because prosecuting the lender liability claims would require a tremendous expenditure of both time and legal fees. Mathieu became irate at the idea of having to pay still

---

**3.** The mediator was Arden Siegendorf, a retired state Circuit Judge, who has handled approxi-

mately 1,800 mediations.

more attorney fees. Because Mathieu was so emotional about the case, the mediator called an adjournment to allow Mathieu to cool off and think rationally about his financial situation.

After the adjournment was called, Hildreth suggested to Byrne that he not contact the Debtors but that Hildreth attempt to use the rapport he had established with them to convince them that the settlement was in their best interests. Hildreth did visit the Debtors at their home and they agreed to accept a settlement on terms negotiated at the mediation. The settlement included terms that led to the confirmation of the Debtors' Chapter 11 plan on December 15, 1993. Mathieu ordered Hildreth not to communicate further with Byrne, which resulted in Byrne not even knowing that a plan had been confirmed and the adversary proceeding settled. Shortly after the mediation, Mathieu hired a private investigator to investigate Byrne. That investigation apparently produced some, if not all of the information upon which Mathieu seeks to deny all compensation to P & H.

In April of 1992, P & H filed an interim fee application for services provided to the Debtors between August 9, 1991 and March 15, 1992 in the amount of $35,000 attorney fees for ESS and $4,000 attorney fees for the Mathieus. P & H sought reimbursement for expenses in the amount of $3,982.59 for ESS and $468.11 for the Mathieus. This application included voluntary reductions for travel time and for possible duplication of efforts with Hildreth totaling over $6,000. Mathieu voiced no objection to this fee application. In an Order dated July 27, 1992, this Court authorized payment of $17,500 attorney fees for ESS, $2,000 attorney fees for the Mathieus, $3,982.59 in costs for ESS, and $468.11 in costs for the Mathieus. The remainder of the fees was to be determined at the conclusion of the case.

P & H filed a supplement to the fee application (actually a final application) in February 1994. This application covered the period from March 16, 1992, through January 31, 1994, and sought $62,470.50 in fees and $9,166.42 in costs, in addition to asking for payment of the remaining $19,500 from the first fee application. The amount requested in this application was $81,970.50 in fees, and $9,166.42 in costs, for a grand total requested of $91,136.92.

David L. Fleming, Esq., ("Fleming") filed a notice of special appearance for the Debtors in April 1994, appearing solely to work on opposition to the fee application of P & H. At the same time, Fleming filed a motion to continue the hearing on P & H's fee application to give him time for discovery and to prepare and present the Debtors' opposition to the application. The Debtors failed to file a formal objection to the fee application until after this Court entered an order granting P & H's Motion to Compel the filing of Debtors' written objections. When filed, Debtors' objection alleged that P & H failed to disclose several conflicts of interest and that P & H engaged in improper billing, failed to exercise due diligence in prosecuting Debtors' lender liability claims against a creditor, and attorney misconduct at a mediation.

A hearing on the fee application and the objections was held June 30, 1994. At this hearing, P & H filed a second supplement to its fee application. This supplement included voluntary reductions for the period covered by the application under consideration here and also asked for fees and costs incurred during the defense of the fee application. For the purposes of this opinion, the only aspects of this second supplement that will be considered are the voluntary reductions for the period covered by the first supplement (March 16, 1992, through January 31, 1994). The voluntary reductions for this period total more than $19,000. As requested in this second supplement, the amount of fees and costs sought for this period totals $52,415.06.

The Court reserved ruling on the matter and granted the parties thirty days to file written closing arguments and memoranda of law. In August 1994, Debtors filed a memorandum regarding P & H's qualifications to receive compensation. This memorandum asserted that compensation was either barred or should be reduced pursuant to 11

U.S.C. § 328(c)[4] for P & H's failure to comply with the requirements of 11 U.S.C. § 327(a)[5]. P & H timely filed its memorandum in support of its supplemental fee application.

In Debtors' Memorandum Regarding Qualification of Pennington & Haben, P.A. for Compensation Under Sections 327(a) and 328(c) of the Bankruptcy Code, the Debtors argued that P & H is not a "disinterested person" within the meaning of 11 U.S.C. § 327(a) and should therefore be barred from receiving compensation pursuant to the provisions of 11 U.S.C. § 328(c). Section 327(a) of the Bankruptcy Code has two requirements: (1) that the attorney for the Debtor be a "disinterested person," and (2) that the attorney for the Debtor may not hold or represent an adverse interest to the estate. "Disinterested person" is a term defined by the Code as a person that:

(A) is not a creditor, an equity security holder, or an insider;

(B) is not and was not an investment banker for any outstanding security of the debtor;

(C) has not been, within three years before the date of filing of the petition, an investment banker for a security of the debtor, or an attorney for such an investment banker in connection with the offer, sale, or issuance of a security of the debtor;

(D) is not and was not, within two years before the date of the filing of the petition, a director, officer, or employee of the debtor or of an investment banker specified in subparagraph (B) or (C) of this paragraph; and

(E) does not have an interest materially adverse to the interest of the estate or of any class of creditor or equity security holders, by reason of any direct or indirect relationship to, connection with, or interest in, the debtor or an investment banker specified in subparagraph (B) or (C) of this paragraph, or for any other reason;

11 U.S.C. § 101(14).

The provision of § 327(a) that an attorney may not hold an interest adverse to the estate has been held to be essentially synonymous with the requirements of § 101(14)(E). *In re Adam Furniture Industries, Inc.*, 158 B.R. 291 (Bkrtcy.S.D.Ga.1993). The requirement of § 327(a) that an attorney may not have represented an interest adverse to the estate is in addition to the requirements of § 101(14). *Id.* at 296. The term "adverse interest" is not defined by the Code, but by case law. Adverse interest has been defined as "possessing or asserting any economic interest that would tend to lessen the value of the estate or create either an actual or potential dispute in which the estate is a rival claimant." *In re The Red Lion, Inc.*, 166 B.R. 296, 298 (Bkrtcy.S.D.Tex.1994).

The first conflict of interest asserted in Debtors' objection was that Byrne was a member of the SBA Regional Advisory Council ("the Council") and Byrne failed to disclose this membership to the Debtors and the Court. The Debtors make two arguments in support of this assertion. First, the Debtors argue that since the loans that were the subject of the adversary proceeding against Bay Bank were guaranteed by the SBA, Byrne was required to have disclosed his involvement with the Council. Byrne's only active involvement with the Council was before he was even asked to become a member. In October of 1992, Byrne had given a presentation at a Council meeting in Jacksonville, Florida. The members of the Council and Mr. Tom Short, the SBA District Director, were so impressed with Byrne's presentation that Mr. Short invited Byrne to join the Council. Byrne did accept an ap-

---

**4.** In pertinent part, 11 U.S.C. 328(c) provides: "the court may deny allowance of compensation for services and reimbursement of expenses of a professional person employed under section 327 or 1003 of this title, if at any time during such professional person's employment under section 327 or 1003 of this title, such professional person is not a disinterested person, or represents or holds an interest adverse to the interest of the estate with respect to the matter on which such professional person is employed."

**5.** Section 327(a) allows the court to authorize the employment of "attorneys, accountants, appraisers, auctioneers, or other professional persons, that do not hold or represent an adverse interest to the estate, and that are disinterested persons...."

pointment to the Council. However, since the time that Byrne was invited to join, the Council has not held a meeting and Byrne has had virtually no contact with the Council.

The Council is a group of businessmen from the region that serves as a liaison between the SBA and the business community to advise the SBA on how it can better serve the business community. The Council does not make policies and procedures of the SBA, nor does it have any involvement whatsoever with the SBA loan process. Despite Mathieu's assertions to the contrary, Byrne testified that he had indeed advised Mathieu on numerous occasions of his involvement with the Council.

Debtors argue that Byrne's failure to conduct discovery of the SBA, despite repeated requests by the Debtors to do so, proves that Byrne was putting the interests of the SBA ahead of the Debtors' interests. Byrne testified that he believed that he had all of the relevant loan documents and that it would have been unnecessary to conduct time-consuming (and therefore expensive) discovery of the SBA. Byrne explained that Bay Bank was an SBA approved lender that had the power to write SBA loans without sending all of the paperwork through the usual SBA channels, thus no additional loan documentation would have been held by the SBA. I find Byrne's explanation reasonable under the circumstances. Accordingly, I find this allegation to be entirely without merit under the instant facts. The SBA Regional Advisory Council possesses no cognizable interest adverse to the Debtors' estate. Byrne's membership in the Council is not even a potential conflict that mandated disclosure and certainly does not demonstrate an adverse interest that requires action by this Court.

■ The second conflict asserted is the alleged affiliation between Byrne and the First National Bank of Grady County, Georgia ("FNB Grady"). Byrne's wife owns stock in and serves on the board of the FNB Grady holding company. Neither Byrne nor his wife actively participate in the affairs of the bank nor do they have any knowledge of the bank's business dealings. Debtors' argument that FNB Grady has "unusually close

ties" to Bay Bank is completely irrelevant under the instant facts. The evidence presented shows that the only ties between FNB Grady and Bay Bank are that FNB Grady routinely purchased loans from Bay Bank. The unrefuted testimony of Charles Stafford, CEO of FNB Grady, established that neither Byrne nor his wife would have had any reason to know of the relationship between FNB Grady and Bay Bank. Byrne's testimony was that they had no knowledge of the relationship and Mathieu acknowledged that he had no knowledge of any facts to the contrary.

Notwithstanding the commercial relationship between Bay Bank and FNB Grady, the relationship between Byrne and FNB Grady is tenuous at best. Even had Byrne known of the relationship, there still would be no conflict given the nature of the relationship between the two banks. FNB Grady merely purchased loans from Bay Bank after a thorough review of each loan according to its lending policies. The financial affairs of Bay Bank had absolutely no bearing on the soundness of the loans purchased by FNB Grady, which looked solely to the makers thereof for payment. Under the relevant law and facts, these relatively insignificant connections do not create any interest adverse to the Debtor's estate that warrants disqualification.

The third conflict of interest asserted in Debtors' objection was that John Christo, a member of the family that controls Bay Bank, was the best man in the wedding of the sister-in-law of a P & H associate that also worked on Debtors' adversary proceeding. This allegation was abandoned by the Debtors at the hearing, and deservedly so.

The cases cited by Fleming in support of the alleged conflicts of interest are inapposite to the instant facts. None of Debtors' allegations establish that P & H was not a disinterested person within the meaning of § 101(14) of the Code. At best, the conflicts existed only in Mathieu's overactive imagination and at worst, they are merely a desperate attempt to avoid paying the fees earned by P & H. The lengths to which Mathieu went to dig up dirt on Byrne strongly suggest the latter. I find these alleged conflicts to be

frivolous and not properly grounded on applicable law.

The Debtors alleged six grounds for why the fee application should be reduced: the number of hours charged was excessive in light of the results obtained, the hourly rates charged were excessive, expenses were inappropriate or not recoverable, unwarranted duplication of efforts, the failure to exercise due diligence in prosecuting Debtors' claims against Bay Bank, and inappropriate conduct by Byrne at the mediation that forced the Debtors to accept an allegedly unfavorable settlement.

The first three grounds asserted for a reduction in fees are not supported by any evidence or argument before the Court. At no time during the course of this case had the Debtors voiced any objection to this Court or to P & H about the hourly rates or the number of hours charged by P & H.

■ Debtors allege that excessive hours were billed for the October 9th and 10th, 1991 meeting between Byrne and the Debtors. Mathieu says that he sat in Byrne's office for most of two days, being completely ignored. At the hearing Debtor asserted that it was ridiculous for Byrne to charge him for nine hours when Byrne had only given not more than hour's worth of time to him. However, Mathieu almost immediately contradicts himself when he says "[f]rom 1:00, 1:30 to 4:00, 4:30 in the afternoon, we never talked to him for five minutes without being interrupted." Byrne's production of time records and thirteen legal pages of handwritten notes on the Debtors' loans and financial situation taken at those meetings is concrete evidence that refutes Mathieu's often contradictory testimony. The Court also notes that this meeting occurred during the time period covered by P & H's initial fee application, which was never objected to by the Debtors.

Debtors presented no evidence as to why the hourly rates charged were excessive. The testimony presented by the Debtors in support of the excessive hours allegation is

not credible in light of the evidence produced by P & H. Accordingly, I conclude that both the amount of hours charged and the hourly rates are reasonable and appropriate, in light of the voluntary reductions included [6].

■ Debtors' assertion that P & H agreed not to charge for travel and expenses, pursuant to "firm policy", is without merit. The engagement letter makes no mention of such an unusual arrangement and this Court will not imply such a provision solely on the basis of Mathieu's testimony. Expenses that may be properly charged to a debtor's estate are expenses that can be clearly attributed to a particular client's account. *In re Island Helicopter Corp.*, 53 B.R. 71 (Bkrtcy. E.D.N.Y.1985). "Examples include court fees, transcription fees, out of town travel expenses, delivery service, long distance telephone calls and postage expenses." *Id.* at 73. Travel expenses are customarily charged to the client and it is highly unlikely that an established law firm would absorb such charges in this particular type of action. The expenses and costs claimed are both appropriate and reasonable.

The Debtors failed to present evidence of P & H's duplication of efforts with Hildreth. The fee application, as supplemented, already included voluntary reductions of over $25,000 for possible duplication of efforts of P & H with those of Hildreth. I find these reductions sufficient to offset any unwarranted duplication of efforts.

■ The alleged failure to use due diligence in prosecuting the lender liability claims against Bay Bank is based upon the Debtors' dissatisfaction with the end result of this case. The Debtors never accepted the fact that the lender liability claims had serious problems with the applicable statute of limitations, with proof of the anti-tying claims, and with the amount of damages. The Debtors refused to agree with Byrne and Hildreth's assessment that, while the lender liability claims may have had some merit, it was economically unfeasible to litigate those claims. Both attorneys told the Debtors that the litigation expenses could far

---

6. This Court has a policy of only allowing 50% of normal hourly rates to be charged for travel time, unless that travel time is proven to be

productive and beneficial to the client. The application includes voluntary reductions to account for this policy.

outweigh any possible recovery. Mathieu was convinced that he had a million dollar case and refused to accept the conclusion of his attorneys. As Byrne so aptly testified about Mathieu at the hearing, "he wanted his pound of flesh and he was not going to consider any settlement."

Debtors' disappointment with the results of the litigation is unwarranted considering the dire financial predicament they were in. In fact, the strategic decision by Debtors' counsel to use the lender liability claims against Bay Bank as leverage to settle the Chapter 11 cases proved to be a very successful tactic that led to a confirmed Chapter 11 plan. The Debtors' dissatisfaction with the results achieved in the litigation hardly mandates a finding of the lack of due diligence by an attorney [7].

■ Debtors' final allegation of misconduct involves Byrne's actions at the mediation in November of 1993. The Debtors claim that Byrne's "resignation" forced them to accept an unfavorable settlement. Any competent attorney knows that withdrawing from representation is not quite so simple as saying, "I quit." No request for withdrawal was made to this Court until after the Debtors objected to P & H's fee application. Byrne is an experienced attorney, and his testimony clearly shows that he had no intention of abandoning the Debtors [8]. Byrne had attempted to explain to his client that the successful prosecution of lender liability claims is extremely difficult and would require a significant (and justified) expenditure of attorney fees. Byrne tried to explain that the expense of litigating the adversary proceeding against Bay Bank would be tremendous, and that he and his firm would be rightfully entitled to compensation for their efforts.

Mathieu's claim that he was forced to accept an unfavorable settlement flies in the face of the fact that Hildreth had proposed very similar terms for settlement just a few months earlier. The end result of the settlement was actually quite favorable to the Debtors. Bay Bank took back a gasoline contaminated property for the full appraised value and applied that value to the outstanding balance of Debtors' obligations. Bay Bank refinanced the remaining balance outstanding on Debtors' loans at a more favorable interest rate, agreed to release Debtors' personal residence and a liquor license upon repayment of $50,000 principal [9], and agreed to release Debtors from all civil liability and clean up costs for the gasoline contaminated property. Hildreth testified at the hearing that he felt that a piecemeal settlement would have been possible, resolving the Chapter 11 plan but leaving the lender liability claims open. The testimony of Lofton J. Westmoreland, counsel for Bay Bank, and common sense belies that notion. It is ludicrous to believe that a banking institution would agree to take back a contaminated property at full market value, renegotiate a commercial loan, absolve a borrower of liability for civil judgments and clean up costs of a contaminated property, while leaving itself exposed to a potentially substantial lender liability judgement. Mathieu was hardly the hapless victim of a "bum deal" as he attempts to portray himself to this Court.

Mathieu's pauper argument that Byrne's conduct at the mediation left him in a position where he was forced to accept an unfavorable settlement because he had no money to hire additional counsel flies in the face of the fact that Mathieu paid $5,000 to retain Fleming and agreed to pay Fleming a minimum fee of $10,000, or 20% of any savings on P & H's fee application [10]. The evidence

---

7. The fact that P & H took no less than 22 depositions in attempting to prosecute the lender liability claims adds even more support to this Court's conclusion.

8. Byrne is supported by Arden Siegendorf, the mediator, who testified that he had no recollection of Byrne making any such statements at the mediation.

9. Shortly after confirmation, the Debtors sold the liquor license for $100,000 resulting in a net of

$50,000 with which they made payments to professionals other than P & H.

10. This Court also notes that the Debtors paid Hildreth $50,000, an accountant $20,000 (without this Court's approval), and also $5,000 to an environmental law firm for services in connection with the contaminated property, all within just a few months after this mediation.

presented shows that Fleming was involved tangentially in this case for approximately a year before making any formal appearance. It was Fleming who suggested to Hildreth that the adversary complaint be amended to add an anti-tying count, and it is Fleming who insists that Mathieu's claim was worth several million dollars. If Fleming was so impressed by the viability of the lender liability claims, it seems logical that he would have made himself available to prosecute these valuable claims on a contingency basis, not merely to protest a fee application.

■ Two other arguments made by the Debtors are equally unpersuasive. They first argue that Byrne was not diligent in the prosecution of the lender liability claim because he failed to retain an expert, such as an economist, to analyze and present a computation of damages. If this had been a situation in which trial of the action was the goal and the plaintiff had the financial ability to fund the litigation, the retention of an expensive consultant may have been warranted. However, in the context of a financially distressed chapter 11 debtor in need of a successful reorganization which was dependent on a timely resolution of the claim against the bank, the expense of such an expert could not be justified.

■ The Debtor's argument that Byrne did not have the background in bankruptcy reorganizations that he represented when he initially took responsibility for the cases completely ignores the fact that within weeks of Hildreth's departure, he was back in the cases handling the bankruptcy aspects of the cases. Byrne's responsibilities were limited to the handling of the action against the bank.

The evidence presented in this matter completely fails to support any of the Debtors' objections to the fees requested by P & H. If the Debtors were so dissatisfied with the services provided, they could have, at any time, terminated the firm and sought other counsel, either Hildreth or Fleming, perhaps. Instead, they waited until P & H had invested over two years in the litigation of the case, and then hired a private investigator in an effort to find an excuse to deny all fees to P & H when it became obvious that Byrne and

the firm would not completely finance Mathieu's quest for his "pound of flesh" from the bank. The result achieved in putting the Debtors in a position to successfully reorganize justifies an award of the fees requested.

Accordingly, I find that P & H is entitled to an award of fees in the amount of $43,805.00 for the period of March 16, 1992 through January 31, 1994, together with costs in the amount of $8,610.06 plus the balance from the earlier applications of $17,500 from ESS and $2,000 from the Mathieus for a total award of $71,915.06.

■ Currently pending before the court, but not yet heard, is the supplemental application filed by P & H for fees incurred in connection with litigating the objection dealt with herein. Given the findings set forth in this opinion, I am compelled to consider, *sua sponte,* pursuant to the requirements of Rule 9011, Federal Rules of Bankruptcy Procedure the imposition of sanctions on Mr. Fleming, the Mathieus, or all of them. Accordingly, pursuant to the requirements of B.R. 9011, notice is hereby given that the court will, in conjunction with any hearing on P & H's supplemental application for fees, consider the imposition of sanctions, as may be appropriate, on David Fleming, Esq., Edgar and Jane Mathieu or all, jointly and severally.

This opinion constitutes the court's findings of fact and conclusions of law in accordance with Bankruptcy Rule 7052. A separate order will be entered in accordance herewith.

### ORDER AWARDING ATTORNEYS' FEES

THIS MATTER having come on for hearing on the Supplemental Application of Pennington & Haben, P.A. for attorneys' fees and costs and on the objection filed by the debtors thereto, and the court having considered the evidence presented at hearing and the Memoranda of Law and arguments of counsel, and having entered its Memorandum of Opinion of even date herewith setting forth findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, it is hereby

**636**

ORDERED AND ADJUDGED that:

1) The Supplemental Application for Attorneys' Fees and Costs of Pennington & Haben, P.A. be and same is hereby granted and the objection of the debtors is hereby overruled.

2) Pennington & Haben, P.A. is hereby awarded attorneys' fees in the amount of $43,805.00 for the period of March 16, 1992 through January 31, 1994 together with costs in the amount of $8,610.06 plus the balance from the early applications of $17,500.00 from Edgewater Sun Spot and $2,000.00 from the Mathieus for a total award of $71,915.06.

3) Pursuant to Bankruptcy Rule 9011, notice is hereby given that the court will consider imposition of sanctions on debtors' counsel, David Fleming, Esq., the debtors, or all of them jointly and severally in connection with the hearing on the supplemental application filed by Pennington & Haben, P.A. at the hearing on the instant application.

DONE AND ORDERED.